## *142]　*Lessee of Henry Hill *against* William West, Peter Thompson and Nicholas Young. Lessee of Hannah Moore *against* Same Defendants.

By a general deed made in 1704, by first purchasers of 5000 acres, with the appurtenances, city lots incident thereto, though previously surveyed, will pass together with liberty lands, unless a contrary intention can be shewn.

EJECTMENT for two lots of ground, in the city of Philadelphia. The causes came on to trial at *Nisi Prius*, on the 28th August 1804, when it was agreed, that a juror should be withdrawn, and the following case be submitted to the opinion of the court.

Richard Pearce, James Craven, Thomas Pearce, Thomas Phelps, and Samuel Taverner, were original purchasers of 5000 acres, from the proprietary, William Penn, and entitled in right of such purchase to liberty land and city lots.

On the 17th of 5th mo. 1683, four warrants issued to survey the city lots in the names of Richard Pearce, Thomas Pearce, Thomas Phelps, and Samuel Taverner all of Limerick in Ireland.

On the 1st of 12th mo. 1685, four surveys were made thereof ; which on the 12th of 7th mo. 1688, were returned into the office of the Surveyor General, one to each of them, as joint purchasers.

Richard Pearce died, and Thomas Pearce became intitled to his tract of 1000 acres, as his son and heir at law.

On the 18th July 1699 a warrant issued to survey the liberty land, in the name of Thomas Pearce, and others.

On the 11th August 1699, a survey was made thereof, and on the 26th February 1700, a patent of confirmation issued to Thomas Pearce and others, for 108 acres of liberty land, reciting the original purchase.

On the 24th August 1704, John Phelps, son and heir of Thomas Phelps, Samuel Taverner and Thomas Pearce, son and heir of Richard Pearce, granted and conveyed their 4000 acres of the land to James Shattick and Edward Lane, by the following description, to wit : " 5000 acres of land, situate, lying, and being " in the province of Pennsylvania aforesaid, with their and every " of their appurtenances, in manner following, to wit : the said " John Phelps 1000 acres ; the said Samuel Taverner 1000 acres " more ; the said Thomas Pearce 2000 acres more ; and the said " James Craven 1000 acres more, residue of the said 5000 acres, " which said 5000 acres of land were heretofore granted and " conveyed to the said Thomas Phelps, Samuel Taverner, Rich- " ard Pearce, James Craven, and Thomas Pearce, and their heirs, " to some or one of them, by William Penn, esq., in and by seve- " ral deeds and conveyances, and according to the several parts " and proportions aforesaid ; and also all their and every of their " right, title, interest, freehold, inheritance, property, challenge, " *claim, or demand, whatsoever of them the said John [*143 " Phelps, Samuel Taverner, Thomas Pearce, and James " Craven, or either of them, of, in, or to the said 5000 acres of " land, and of, in, and to every part, and parcel thereof, with " their appurtenances, in as large, ample, and beneficial a man- " ner as they, or any, or either of them, may, can, or might, or " ought to have, hold, and enjoy the same premises, or any part " thereof, together with all deeds, evidences, and writings," &c. &c. The consideration money was 150l.

James Craven did not execute this conveyance : from the stamps on it, the deed appeared to have been executed in Ireland. Four of the original grantors are stated therein to be of the city of Limerick, in Ireland.

On the 16th of 3d mo. 1705, the said James Shattick and Edward Lane, conveyed 20 acres of the liberty land to Josiah Hibbert, in fee.

The question for the opinion of the court, is, whether by the deed of conveyance of the 24th of August 1704, the city lots passed to the grantors ? If the court shall be of opinion in the affirmative, judgments shall be entered for the plaintiffs ; but if they shall be of opinion in the negative, then judgments shall be entered for the defendants.

The case was argued at considerable length, by Messrs. E. Tilghman and Rawle for the plaintiffs, and by Messrs. Ingersoll and Dallas for the defendants.

[Hill's Lessee v. West et al.]

Arguments for the plaintiffs were classed under three heads. 1. What could Phelps and the other grantors convey? 2. What did they profess, and really intend to convey? 3. Have they used apt words to convey the lots of ground in question?

I. The conditions or concessions agreed upon in England on the 11th July 1681, clearly shew what interest vested in the first purchasers, under the five articles first mentioned therein. 1 Dall St. Laws Append. 6.

The proprietary was to lay out for a large town or city in the proportion of 200 acres for every 10,000 acres purchased, if the place would bear it; and every purchaser was to be entitled to 10 acres in the first great town for every 500 acres purchased, if the place would allow it. A town of any degree of compactness would not be effected by this plan; and it was therefore altered by common consent, to accomplish the object in view. A survey therefore of a large tract of land adjoining the city, was directed by William Penn, shortly after the city laid out, called the liberties of the city; upon which a survey was made of about 16,500 acres, for the use and benefit of the first adventurers.

*144]    *[SHIPPEN, C. J. This survey of the liberty lands has been much searched for, but could never be found. The deposition of the former Surveyor General, John Lukens, taken in the case of the lessee of Charles Hurst, against some of the proprietary tenants, which came on to trial about 1773, will throw light on this subject. The liberty lands were bounded by the surveys of the country land, from the river Delaware below, to Delaware above the city, and by the lines of the city.

To these remarks Messrs. E. Tilghman and Lewis, who were counsel in the cause of Hurst, fully agreed.]

Under the new established system, every original purchaser of 500 acres of land became entitled to 490 acres in the country, and either 10 acres of liberty land on the west side of Schuylkill, or 8 acres on the east side, together with a city lot of 3 perches in front, and about 18 perches in depth, making about one third of an acre; that is to say, from 500⅓ acres to 498⅓ acres, as the lot of the purchaser fell on the west, or east side of Schuylkill.

The plaintiffs therefore contend, that the city lot equally with the liberty land form component parts of the original grant, and may in the strictest sense be said to be appurtenant thereto. This appears from William Penn's letter to the society of free traders, in 1 Proud's Hist. 264. He therein tells them, "the "city lot is, besides your liberty land, part of your 20,000 acres "in the country." It will further appear from almost all the ancient deeds, where the country and liberty land and the city lot have been sold together, and have not been previously disjoined by distinct sales of either.

In a deed from John Hornwell to David Powel, dated 9th

April 1716, it is recited, that a city lot becàme vested in Horn-well, in right of Edward Atkinson's original purchase of 500 acres, and that he had obtained a warrant in right thereof.    In a deed from John Wright to Israel Pemberton, dated 29th September 1716, a grant from the proprietaries to William Gibson is recited for 500 acres, and that there doth belong, and of right appertain unto the said 500 acres, a certain lot in the city, and 8 acres of liberty land, which by verdict of the last recited indenture are also vested in the said John Wright, in fee.    Another deed of the same date, from Rees Thomas to the same Israel Pemberton, contains the same recitals.

The uniform opinion also of the proprietary commissioners of property, both in ancient and modern times, agree therewith. A patent to Robert King, dated 24th of 12 mo. 1704, for a city lot, was granted in right of an original purchase.    A patent to Thomas Mayleight, dated 24th of 11 mo. 1705, recites an original *grant to Robert Greenway, of 1500 acres, who [*145 granted 500 acres part thereof to Charity Null, who devised the same to the said Mayleight, and that there was formerly a city lot in right of and appurtenant thereto, surveyed, &c.    A patent to James Logan, dated 1st October 1716, recites a city lot held in right of Henry Geary's purchase of 500 acres ; another lot in right of John Geary's purchase of 500 acres ; and a third lot in right of Samuel Noyes's purchase of 500 acres, which have since severally been legally vested in the said James Logan, &c.

A patent to James Steel dated 12th February 1719–20 for a city lot, was granted in right of an original purchase.    A patent to Isaac Norris and Charles Norris, dated 29th February 1760, for a city lot, is recited to be in right of sir John Sweetapple's purchase of 1000 acres.

A great mass of testimony might be adduced on this point ; but it is presumed, sufficient has been shewn to establish the point contended for, if not to fatigue the patience of the court. Little trouble was requisite to procure the deeds and patents already offered to the court.    If the first adventurers had not obtained rights for city lots, and liberty lands, as necessarily incident to and part of their original purchases, the first proprietary would have been justly chargeable with a breach of his conditions ; but no instance has occurred, wherein they have not become thus entitled, in proportion to the extent of their first purchases.

[The chief justice remarked, that it was a well known fact, that William Penn, on his first coming over, had bought the scite of the city from the Swedes.]

II. The old grant could not have been a joint tenancy, because both Phelps and Pearce released the interests of their fathers.    The grantors and each of them, professed to convey all their right and claim in the original purchase of 5000 acres,

with the appurtenances, in as large, ample and beneficial a manner, as they or either of them held in the premises. More general and comprehensive words could not have been used indicative of their intention to dispose of the whole purchase. The word appurtenances as applied thereto, had an extensive settled meaning, and was not thrown in at random. Whatever is contained in the recital is granted, unless there is an exception. If one grant all his lands in D. containing 10 acres, whereas they really contain 20 acres, by this grant the whole 20 acres will pass. Shep. Touch. 96, (100) cites Dyer 80. A deed shall be construed most strongly against the grantors. 1 H. Bla. 25, 27. The case goes on the ground of description. Equity does not regard the *form of the conveyance, but the substance, *146] the money paid and the intention of the parties. Stra. 602.

It is admitted, that the grantors knew their rights, and that the location of the city lots was fixed by the return of survey, 18 years before the date of the deed, under which the plaintiffs claim; but it is contended, that the grantors intended to release their interest therein.

III. It is moreover contended, that apt words have been used for that purpose. That there is a degree of relation between original purchases and city lots, is indisputable. The proprietaries granted no city lot, except to original purchasers. If they may be considered as appurtenant to the first purchase, then they will pass by that term used in the deed. The old grant confers the right. The purchaser buys three things ; country land, liberty land, and a city lot or lots, according to the extent of his purchase. The city lot is unlocated, but assignable and transmissible.

Land in a strict legal sense cannot be appurtenant to a messuage or land. Plowd. 170. But it is often taken as occupied, used or lying with or to the messuage. Ib. 171. S. C. Dy. 130. A garden may be said to be parcel of a house, and may pass therewith in a grant. 2 Saund. 401. The demise of a house, passes lands occupied therewith. 4 Leon. 183. So of the devise of a house. 2 Rol. Rep. 347. Land may be considered as appurtenant to a house, even in the case of the king, where they have been occupied together a convenient time. Cro. Car. 168. The sense of the term appendant may be seen in 3 Vin. Ab. 1, pl. 2. 2 pl. 7. 3 pl. 13. 4 pl. 22. Jenk. 310, pl. 21. Hetl. 14.

If the premises in question had not been surveyed when the deed of 1704 was executed, no difficulty could have occurred. It will be objected, that this severed the right ; but the true idea of severance, is a separation of the estate and interest, as by alienation ; not by affixing a floating claim to a precise spot. The great point, on which the decision must turn, is whether the location of the premises by a survey made and returned, severs the right under the orig nal purchase.

It is correctly laid down, that usage is the best mode of ex-

pounding an ancient deed.  3 Atky. 577.  A decisive instance of this usage, we are so fortunate as to be able to produce, which will satisfy every reasonable mind.  On the 29th August 1711, a patent issued from William Penn to Henry James, of Bristol, Taylor ; wherein is recited, a grant to Edward Verberley, an original purchaser of 530 acres, whereby he became seised in fee thereof with the appurtenances.  That he died intestate and the 500 acres descended on his daughters.  That on the 6th September 1709, a warrant issued, on which there was surveyed to *the daughters, (naming them,) as appurtenant to the [*147 said 500 acres, a lot of ground in the city of Philadelphia, bounded, &c.  That the said daughters by indentures of lease and release, dated 15th and 16th December 1709, did grant and convey the said 500 acres, with the appurtenances to Henry James, of Bristol, Taylor, in fee, and the said Henry James, by S. C. his attorney, requesting me, that I would confirm the said lot of land to him by patent, I have, &c.  This unequivocally proves a recognition of the usage by the proprietary officers, that a city lot would pass by the general term appurtenances in a deed for the 500 acres, though the city lot had been surveyed.

The incident, accessary, appendant and regardant, shall in most cases pass by the grant of the principal, without the words, with the appurtenances ; but not *e converso*, for the principal doth not pass by the grant of the incident, &c.  *Accessorium non ducit, sed sequitur suum principale.*  Shep. Touch. 86, (89.)

No line of discrimination can be drawn between a city lot and liberty land, which will meet the present question.  Here a patent issued for the liberty land in 1700.  Under the deed of 1704, Shattick and Lane sold to Hilbert 20 acres thereof, as is stated in the case.  And the intention of the grantors to dispose of all their interest in the original purchase, is strongly evidenced by this circumstance, that neither they nor their heirs have ever claimed the lots in question, nor sold them to any other person.

It has been the uniform practice to grant city lots to the descendants of the first purchasers, or their grantees ; and such is the language of the legislature, in their act of 10th April 1781, § 4.  1 St. Laws, 896.

On the 20th July 1781, in pursuance of this law, Samuel Preston Moore, Henry Hill and Richard Wells, the heirs of Richard Hill, who deduced his title under the deed of 1704, filed their claim to the city lots, with the Supreme Executive Council.  In 1782, the surveyor general made his report thereon, and in 1785, the Executive Council made their decision.

The defendants' counsel observed, that the contending parties claimed under the same original title.

On the 28th January 1785, Nicholas Young applied also by memorial to the Supreme Executive Council for the lots in question ; referring therein to a former memorial, made on the

29th April 1782, and stating that the heirs of Richard Hill claimed the same under the general words of an old deed from the first purchasers. On the 28th February 1788, this claim was referred to the Board of Property, upon a third application by Young to council, made on the 20th of the same month. On the 2d September 1789, Young filed a fourth memorial with the Executive *Council, who on the 16th December 1780, *148] referred the same to the land officers to report thereon. The council afterwards referred it to Mr. Ingersoll, the then attorney general, who having been previously retained as counsel for Young, declined giving any official opinion. Thereupon the present ejectments were brought.

The defendants' counsel contended, that the true construction of the deed of 1704, could only be collected from the face of the instrument itself, abstracted from all extraneous circumstances ; and that no usage existed in the present instance, which could controul this construction.

To give permanence to property, it is essentially necessary that the adjudged meaning of words, should be steadily adhered to. It will not conduce to elucidate the points in dispute, by considering the effect which the generality of the words of this deed would have produced, if executed prior to the survey of the city lots ; because the parties then held under the primitive grant. In 1683, warrants are obtained for the city lots. The personal contract of William Penn is thereby abandoned ; and in 1688, the lots are severed by the returns of actual surveys from the original right of purchase. The warrants and surveys confer independent rights, and are equivalent to patents, for the purposes of commencing ejectments. These warrants moreover issued in the joint names of the two Pearces, Phelps and Taverner, and in their joint character. By the returns of survey into the surveyor general's office, these city lots are separated and divided from the old right.

Notwithstanding what has been urged, it is obvious that there is this striking difference between liberty land, and city lots. The former is certainly a component part of the first purchase ; and 8 or 10 acres, as has been already mentioned of liberty land, are deducted from each 500 acres of country land ; and so of larger quantities in the same proportion. By a conveyance therefore of the original purchase of 500 or 5000 acres, the liberty land which constitutes a part thereof, must necessarily pass thereby. But the city lots are incident, not appurtenant to the primitive grant, and form no component part thereof. They are a kind of gratuity to the first adventurers, an addition to the lands already granted. They might therefore survey all, or any of the three species of property, country and liberty land and city lots, as they thought proper, and convey them according to their respective locations, in the same manner as if they had never been united in one grant. And of course, they might relinquish such part, as they did not choose to survey. The

terms appurtenant or appendant are not used in the concessions of July 1681. *The lots are here severally surveyed and returned, one to each of the joint purchasers. [*149

That the city lots were not granted *eo nomine* by the convey-ance of 1704, cannot be denied; that the parties, at the time of the execution thereof, were conusant of the extent of their rights, is admitted. The consideration expressed in the deed was but 150l. A patent had issued for 108 acres of liberty land. Would the sum paid, be an adequate and fair considera-tion for the whole, including the city lots? Whence then are we to infer, that it was the intention of the grantors to transfer all their interest? It will be remembered, that the deed was drawn and executed in Ireland, and must therefore be construed according to the sense of the words as used in that kingdom at the time, and not in the extended sense, in which it is contended it bears as to the point in question, in Pennsylvania.

It is said, there is a peculiarity of phrase indicative of inten-tion; but the phraseology goes no further than we might rea-sonably expect from a skilful conveyancer in a deed for the 5000 acres. All the words clearly refer thereto, or to its com-ponent parts; not to the city lots which were no parcel thereof. The expressions, with the appurtenances, in as large, ample and beneficial a manner as the grantors or either of them held the premises, are to be found in almost every formal deed. The term appurtenances is somewhere called by Lord MANSFIELD the drag-net of all conveyances.

In common speech, appurtenant signifies something apper-taining or belonging to. In a legal sense, land cannot be said to be appurtenant to a messuage or land. So is the resolution already cited from Plowd. 170. 2 Vin. 596. 1 Com. Dig. 376 (573, new ed.) Appendants are ever by prescription, but not so of appurtenants. Both however must agree in quality and nature to the thing, whereunto it is appendant or appurtenant. Co. Lit. 121. b. The surrender of a messuage called Symonds, with the appurtenances, whereto divers copyhold lands were appertaining; nothing passed but the house, with the orchards, yards, &c. Cro. Jac. 526. Grant of a mill with the appurte-nances, a kiln used therewith does not pass. 1 Lev. 131. Lands usually occupied with a house, will not pass under a de-vise "of a messuage with the appurtenances," unless it clearly appears, that the testator meant to extend the word appurte-nances beyond its technical sense. 1 Bos. and Pul. 53. The cases on this subject are fully considered here. One seised of a messuage and two acres of land in C., and of two acres of meadow in K., distant four miles, but used and occupied there-with, devised the said house, with all and singular the appurte-nances thereto, or in any manner belonging, to his son in fee: all the court held, that the two *acres of meadow did not pass thereby; because, by the words *cum pertinentiis*, [*150 land passeth not, but only such things as may be properly per-

taining; but otherwise it had been, if the devise was *cum terris pertinentibus*. Cro. Car. 57. Here it is attempted to be established, that city lots considerably distant from the country land, never occupied therewith, but held by separate and distinct titles, shall pass as appurtenant to such land. If a survey of the country lands would separate them from the city lots, the same thing would be effected by a survey of the latter in the first instance; no other time can be fixed on unless we rely on this period. The warrants and surveys form complete substitutes for the original evidences of title : when these are obtained the deeds of lease and release obtained by the first purchasers are no longer regarded.

The rules of legal construction are not to be superseded by evidence of a light nature. An usage is set up by our adversaries, but none is stated in the case. We do not agree with Judge TUCKER, that there can be no custom or usage in the United States; but we insist, that plain proof should be given thereof, before the rules of law should be accommodated thereto. There could not have been many instances of sales by first purchasers, or their descendants, prior to 1704; and between 1682 and 1704 no usage could have taken place and have reached Ireland, that city lots, when surveyed, would go over to the purchaser, by the magical force of the word appurtenances.

In none of the documents produced by the plaintiffs to establish this pretended usage, do we find the deeds from the first purchasers, but only recitals of them. We have therefore a right to suppose, that when city lots were granted, they were expressly mentioned. We now shew to the court that cases of this kind did occur. On the 31st March 1713, Nicholas Moore conveyed to Richard Hill 1410 acres, part of an original purchase of 10,000 acres, composing the manor of Mooreland, with the appurtenances, and the city lots thereunto belonging, &c. This shews also the idea of Richard Hill upon the subject, under whom the plaintiffs claim, that though the word appurtenances was used, it was still necessary to specify the city lots.

On the 20th February 1718, William Betton, of London, an original purchaser of 5000 acres, conveyed the same to Humphrey Murray, with the appurtenances, and the city lots thereunto belonging to the same Richard Hill. For each of these lots, patents were granted by the Supreme Executive Council to the heirs of Richard Hill, but denied the same to them in the cases before the court, because their pretentions thereto were founded merely on the word appurtenances. In 1682, Benjamin Furley became an original purchaser of 5000 acres. On the * of 4th mo. 1703, he granted 1000 acres, with *151] the appurtenances, to Abraham Dennis and John Lukens in fee; and afterwards in November 1708, by two deeds, he granted the remaining 4000 acres, with the appurtenances, in fee, to        Sproul. Notwithstanding all this, in direct opposition to the plaintiffs' doctrine, the heirs of the same Benja-

min Furley obtained a warrant, in right of his original purchase of 5000 acres, and as appurtenant thereto, for a valuable city lot on High street, to be held in satisfaction of all he was entitled to under his old right.  We may observe also with the plaintiffs' counsel, that a mass of evidence might be brought forward, to shew that no usage had obtained on the point of construction which they have contended for.

The patent to Henry James in 1711, is strongly relied on.  At most, it is but a solitary instance, and cannot prove a custom, which is *communiter usitata et approbata.*  It is subject to the objection, that the releases of the daughters of Verberley have not been shewn to the court, except by recitals in the patent, which are not evidence against the defendants, who do not claim under it.

It does not moreover appear thereby, that the city lot was surveyed, anterior to the sale, by the daughters to James.  The warrant issued on the 6th September 1709, and the deeds were dated 15th December 1709, and though it is recited to have been surveyed when the patent issued, *non constat,* that it was so surveyed when the daughters executed their releases.

The language of the legislature in the 4th section of the act of 10th April 1781, is, that " claims may be thereafter made " upon some of the city lots, by descendants of the original " purchasers under William Penn, esq., or purchasers under his " successors, or grantees, who have neglected to appropriate and " set out the same in severalty, so as to be distinguished from " the common lands, appurtenant to the said city."

It has been remarked, that the original purchasers or their heirs, have never claimed the premises in question, nor disposed of them to others, and that this strongly conduced to prove the intention of the grantors to sell all their right and claim by the deed of 1704.  But how can this intention be reconciled, with the powerful circumstance of their nonclaim from August 1704, until July 1781, a period of nearly seventy-seven years ?

The plaintiffs' counsel in reply.  The pretensions of the plaintiffs are precisely the same in every point of view, as if there had been but one original purchaser.  The decision of the Supreme Executive Council can have no possible weight ; the sole question *is, whether we have not the legal title to the premises in question.  [*152

The deed is *sui generis.*  It contains unusual provisions.  The court will determine on the face of it, but it will call to their aid cotemporaneous expositions.  The first adventurers had unquestionable claim to city lots ; they were not gratuities, nor ever meant as such ; William Penn, however estimable, was not in the habit of making such presents ; this appears by his grants of the lots in Water street, and from the public squares.  He was confined in the Fleet prison many years.  If the city lots passed by the deed to Shattick and Lane, the plaintiffs' claims

are irresistible. The liberty land, located five years before this conveyance, is still held under it. City lots were never attached to the persons of the original purchasers; they passed by general words, as appurtenant thereto, or adjunct, or as parts of the primitive grants.

The question is then reduced to a single point : are words of special description necessary in a conveyance of an old right, after the city lot is located by a survey ? It is not pretended to be so as to liberty land.

Though a city lot is incident to the first purchase, it is not inseparably so. The country land drew with it the city lot, which was subordinate thereto. When an adventurer aliened, he disjoined the country land, and city lot ; but while he kept them together, they might with great propriety be deemed the first purchase. If he sold a part of the country land, it never drew with it a proportionable fractional part of the city lot.

The arguments drawn from the patent granted to Henry James, are very strong. It is true, the facts are mere recitals, but they are the recitals of the old proprietary, which evince his sense of the right, and the practice of his Land Office.

In every patent for a city lot, the deeds of lease and release to the first purchasers are recited. The title and estate continue as before, and no warrant and survey can vest him with a different title or estate. A survey reduces a floating right into possessions, by identifying and fixing its situation ; it gives locality and stability to the primitive interest, but does not alter the nature of the freehold. The object of the grantors in their deed of 1704, was not to destroy the connection between parent and child, but to augment its force ; and no man's act shall be carried beyond his intention, according to the cases cited already in the discussion of these causes.

It is farther apprehended, that an unfavourable decision of this case against the plaintiffs would unsettle many titles to lots in the improved parts of the city, and be productive of the most injurious consequences.

*153] *The court continued the matter under advisement a few days, and then delivered the following opinions.

SHIPPEN, C. J. The question in this case arises on the construction of the deed of 1704, from John Phelps and others, first purchasers of 5000 acres, to Shattick and Lane, whether a city lot annexed to that purchase, which had been laid out and surveyed six years prior to the date of the deed, did or did not pass to the grantees ?

The city lots are not expressly mentioned in the deed to be granted ; but it is contended on the part of the plaintiffs, that by general and comprehensive words in the grant of the land, particularly by the words "with their, and every of their appur- "tenances," the city lots were meant to be granted. And on the part of the defendants, it is contended, and so far very rightly

contended, that by the strictly legal effect and extent of the word appurtenances, land cannot be considered appurtenant to land; but many of the authorities that establish this doctrine, do likewise settle, that if it appear to be the intention of the grantors, that lands should pass by these words, they will pass. The case therefore upon this point, resolves itself into a question of intention.

This intention must be chiefly collected from the deed itself; but in such an ancient transaction, it may receive some light from extraneous circumstances, and cotemporaneous expositions.

City lots have been uniformly described in ancient deeds and instruments as being held in right of, and as appurtenant to, the first purchases. The first proprietor himself, and his officers have generally, if not invariably, designated them as such. In one of the patents produced in the course of this argument, that to Henry James, the proprietor expressly describes the city lot as appurtenant to the purchase of 500 acres; and this case of Henry James, is certainly very apposite to the present one, notwithstanding the ingenious objections made to it. Now, when this word has been so generally used and appropriated to this kind of property, when a man grants the land in the ample and unreserved manner that this land is granted, together with every of its appurtenances, does it not indicate an intention to pass the lots so generally designated as appurtenants?

Again, when the heir of Thomas Pearce grants his right to the original purchase of 5000 acres, with the appurtenances, and every part thereof, (he then resided in Ireland) with all his right and title to the same and every part thereof, in as ample and beneficial a manner, as he can, could or ought to have and hold the same, without making the least exception as to the city lot, could he mean to except it? and what he did not mean to ex- *cept, after using such comprehensive words, he must mean to grant. This idea too receives some confirma- [*154 tion, from the grantors having actually made one exception, by the words except as is herein after excepted; which as appears afterwards, is that they should not be subjected to pay the proprietaries quit rents.

Again: it is now 100 years since the deed was executed. We do not know how long the grantors remained living, after the deed was made; but if they did not mean to sell their whole estate, the city lots as well as the country land, is it not strange, that they should never make a separate grant of these lots to any other person?

But it is objected, that however the city lots might have been considered as appurtenant to the first purchase, while they remained connected with, and not separated from the 5000 acres, yet after surveys of the lots under warrants from the first proprietor, it could no longer be considered as such; the actual laying off and surveying the same, causing an entire severance and separation from the 5000 acres, being then not held under

4 YEATES—10

the original purpose, but a new and distinct title, namely, the warrants and surveys.

The right under which the first purchasers held the liberty land and city lots, was precisely the same, by which they held the country land : it was by the deeds of lease and release, together with the instrument called the concessions made to the purchasers, and to which they were parties, as well as the proprietor.   By the first, the 5000 acres were granted generally : by the concessions it was stipulated in what manner the thing granted should be located and laid off, partly in the country and partly in the city and liberties.    The whole was one purchase ; the consideration, money was paid equally for the liberty land and city lot as the country land.    This appears by the patents for the city lots, the proprietor expressly declaring the grant made, to be for, and in consideration, in the indentures of lease and release mentioned ; so that, altogether, they were considered as one entire purchase.    In this view of the case therefore, it does not seem material which part was first surveyed, the only effect of the survey being to ascertain the several spots they had a right to, under the original purchase.

Upon the whole, I cannot resist the impression, that the grantors in the present case meant by their deed of 1704, to grant all the land they held ; and of course their right to the city lots, as well as the country land.    My opinion therefore is, that judgments should be given for the plaintiffs.

YEATES, J.    I feel it my duty to declare, that my judgment is not satisfied, that the deed of 24th August 1704, passed the city lots in question, to James Shattick and Edward Lane, the grantees *therein named.    The terms of the deed, however *155] large and general, or the word appurtenances, under all the circumstances of the case, are not sufficient, in my mind, legally to effect that end ; nor has that kind of evidence of the cotemporaneous exposition of such ancient deeds been offered, which satisfies my understanding in that particular.

I freely admit, that the original grantees, under the deeds of lease and release, or their descendants, not claiming the city lots, nor having transferred them to others, besides those under whom the plaintiffs claim, afford thereby a degree of evidence of intention in the parties, as to the premises in controversy : but this of itself, is not of sufficient weight to determine my judgment, to carry the construction of the deed to the extent contended for by the plaintiffs' counsel.    This opinion however, I pronounce with great diffidence, from my inexperience of the origin of titles to city lots in early times.

SMITH, J.    The material question in this case is, whether the conveyance of 24th August 1704, transferred together with the 5000 acres, the city lots as appurtenant thereunto.

It is a general rule, that land cannot be appurtenant to land ; but this, like almost every other general rule, is subject to ex-

ceptions.   The clear intention of the parties may take the case out of the general rule.   No rule can be general, unless as applied to a subject matter similar in every circumstance.

No case has been cited, where by the law of England, the grantee of an ascertained quantity of land is thereby entitled to a lot in any city.   But by the grants from the first proprietors of Pennsylvania, every purchaser of a certain quantity of land in the country, is entitled of right, and as incident thereunto, to a proportioned city lot ; and in all recitals of the proprietors respecting such city lots, they are said to be as appurtenant to the country land.   It is acknowledged, that if at the conveyance of the country land with the appurtenances, the city lot incident thereto, was not surveyed, it would pass by the general words ; but it is contended, that by being surveyed, it is severed, and does not pass without special words descriptive of it ; for that the patents granted on the warrants and surveys of the city lots, does not recite the original grant of the land.   If so, I cannot hesitate to say, that the city lots will pass after such warrants and surveys, by the same general words, unless it can be clearly collected from all the circumstances that they were excepted.

No additional consideration is paid for the warrant to survey the city lot.   It is granted for the lot, as appurtenant to the land, and recites the grant of the land.   In vain therefore is it said, that the patent on the survey of the city lot does not recite *the original grant, but only the warrant, when that warrant recites the original grant.                                          [*156

That the parties in interest against the construction contended for on the part of the plaintiffs, must have considered that the city lots did pass, may be inferred ; because, for about 80 years they never pretended to claim the same.

The meaning of the word appurtenances, being appropriated by the lord of the soil, and made descriptive of the city lots as incident to the land, it cannot be confined within the trammels of the laws of England.

It seems to me, that the city lot passes of course, by a grant of the lands with the appurtenances ; but the presumption that it does so pass, may, like every other presumption, be repelled by evidence, that it was not the intention of the parties.

No circumstance has in this instance been brought to repel the presumption : on the contrary, it is fortified by the acquiescence of the original purchasers, and their heirs ; none of whom came forward for 80 years, to claim these lots ; from whence it appears, that it was the intention of the parties to the deed of 1704, that the lots should pass with the land.

BRACKENRIDGE, J.   I had prepared a written opinion on this case, which I have mislaid, and cannot recover at present.

The right to the liberty lands and city lots, depends on the same word appurtenances.   In the patent to Henry James, the proprietor adopts the word in its full extent.   I think I cannot

[Tittermary v. Gardiner.]

account for the liberty land and city lots, not being specified in this deed : they were not much regarded, but viewed as objects at a great distance. *De minimis non curat lex.*

The term appurtenances in the conveyance under consideration, has, a substantial application to the liberty lands and city lots ; and the non-claim of the original purchasers, and their descendants for so great a length of time, is a powerful proof of the intention of the grantors, to release all their claim and interest, under the primitive grant.

I am clear without difficulty, that judgment be entered for the plaintiffs.

Judgments *pro quer.*

Cited in 1 Miles 49.
Cited in 74 Pa. 33 to show that land under some circumstances, may be so annexed to other land as to pass as an appurtenant.